IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JEFFREY MYERS,<br><br>        Plaintiff,<br>   v.<br><br>BEAVERTON SCHOOL DISTRICT 48J,<br><br>        Defendant. | Case No.: 3:25-cv-00677-AN<br><br><br>OPINION AND ORDER |

        Self-represented plaintiff Jeffrey Myers brings this action against defendant Beaverton School District 48J ("defendant" or the "District"), alleging that defendant's implementation of a digital hall pass ("DHP") system violates his substantive liberty interest in the care, custody, and control of his child and his procedural due process rights under the Fourteenth Amendment, Oregon Revised Statutes ("ORS") § 336.187, and Article I, sections 9 and 10 of the Oregon Constitution.[1] On May 23, 2025, plaintiff filed a motion for temporary restraining order ("TRO") and preliminary injunction. The Court heard oral argument from the parties on July 3, 2025. For the reasons stated on the record and discussed below, plaintiff's motion is DENIED.

## LEGAL STANDARD

        TROs and preliminary injunctions are governed by the same legal standard. *See* Fed. R. Civ. P. 65; *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) ("[O]ur analysis is substantially identical for the [preliminary] injunction and the TRO"), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). To obtain a TRO or

---

[1] Plaintiff initially also alleged a claim under ORS § 336.184 in his complaint but has now withdrawn this claim. *See* Pl. Resp. Opp'n Def. Mot. to Dismiss ("Pl. Resp."), ECF [26], at 3. Plaintiff also clarifies that he does not assert independent claims under either the Family Educational Rights and Privacy Act ("FERPA") or the Protection of Pupil Rights Amendment ("PPRA"), and that he cites these statutes only as relevant context for his constitutional and statutory claims. *Id.*

1

preliminary injunction, a plaintiff must show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the favor of the plaintiff; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20-22. Under the Ninth Circuit's sliding-scale approach, if there are "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff," as well as a showing that plaintiff will suffer irreparable harm and the injunction is in the public interest, then a preliminary injunction may still issue. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

## BACKGROUND

A.  **Factual Background**

Defendant is required by Oregon law and school board policy to take attendance of its students. Decl. Robin Kobrowski Supp. Def. Resp. Opp'n Pl. Mot. for TRO & Prelim. Inj. ("Kobrowski Decl."), ECF [15], ¶¶ 3-4 & Ex. 1; Decl. Brian Peerenboom Supp. Def. Resp. Opp'n Pl. Mot. for TRO & Prelim. Inj. ("Peerenboom Decl."), ECF [16], ¶ 5. As part of defendant's attendance procedures, schools within the District require students to request to leave class for any reason. Kobrowski Decl. ¶ 4. Daily and class attendance for students is mandatory, and teachers monitor attendance for each class period. *Id.* When students request to leave class, teachers monitor "the frequency and length of time that students are out of class." *Id.* Secondary schools, such as middle schools, have "campus monitors who sweep hallways" to maintain safety and direct students back to class. *Id.* ¶ 5. Defendant monitors students' whereabouts to provide a safe educational environment, increase educational opportunities, and minimize students' engagement in inappropriate activities outside of class. *Id.*

Before the DHP system, schools used either a paper hall pass system or a sign-out sheet, depending on the teacher's individual process, when a student requested to leave during class time. *Id.* ¶ 4; Peerenboom Decl. ¶¶ 5-6. At Mountain View Middle School ("MVMS"), where plaintiff's child is a student, the paper hall pass system varied amongst teachers; it provided no method for staff to monitor the frequency that a student requested a hall pass, and teachers were unaware which other students, or how many other students, were already out of class at a given time. Peerenboom Decl. ¶¶ 5-6. This limited

oversight of the paper hall pass system sometimes meant that multiple students would gather in the hallways or other communal spaces during class time, which occasionally led to negative interactions between students and vandalism to school property. *Id.* ¶ 6. Under the paper hall pass system, teachers sometimes referred students for additional behavioral or academic support if necessary, particularly if a teacher noticed that a student frequently left class or stayed away for long periods of time. *Id.* ¶ 15.

In June 2024, defendant's Executive Administrators met with middle school building administrators and discussed a pilot program of the DHP system, which was then successfully implemented through defendant's data management platform Synergy Student Information System ("Synergy SIS") to replace paper hall pass systems at Whitford Middle School. Kobrowski Decl. ¶ 6; Corrected & Suppl. Decl. James Newton Supp. Def. Resp. Opp'n Pl. Mot. for TRO & Prelim. Inj. ("Newton Decl."), ECF [35], ¶ 4. Thereafter, other middle school administrators expressed interest in using the DHP system within their schools to provide a more efficient and effective process for granting hall passes to students. Kobrowski Decl. ¶ 6. The DHP system digitized an aspect of an analog system of defendant's attendance procedures that was already in effect. *See* Peerenboom Decl. ¶¶ 5, 11.

At MVMS, the primary goal in implementing the DHP system was to increase student safety on campus by creating a digital system for monitoring students' whereabouts. *Id.* ¶¶ 6, 13. Before the DHP system, each teacher implemented slightly different approaches to granting hall passes in their classroom. Peerenboom Decl. ¶¶ 5-6. Defendant believed that the DHP system would increase efficiency in approving requests to leave class for both students and teachers and create a streamlined, universal, and equitable procedure for teachers to grant hall passes. Kobrowski Decl. ¶¶ 6-8; *see* Peerenboom Decl. ¶ 5. Furthermore, defendant sought to minimize attention placed on students requesting to leave class; such attention could be avoided through digital requests, rather than requiring students to verbally ask for permission to leave class. Peerenboom Decl. ¶ 6.

On December 2, 2024, five eighth-grade teachers at MVMS implemented the DHP system in their classes. *Id.* ¶ 8. Before the system's implementation, Advisory teachers developed a PowerPoint presentation to explain to students how to request a hall pass through the DHP system. *Id.* On January 17,

3

2025, some of the eighth-grade teachers presented to other MVMS teachers about the DHP system, and on January 21, 2025, MVMS teachers presented to the remainder of MVMS students the same PowerPoint presentation about how to use the DHP system. *Id.* ¶¶ 9-10.

On January 24, 2025, plaintiff learned from his child that MVMS had implemented the DHP system. First Am. Compl. ("FAC"), ECF [8], ¶ 11. Plaintiff alleges that when the DHP system was introduced, it was limited to restroom usage; however, within approximately two months, the DHP system was expanded to include visits to the health room, student lockers, and technology support. *Id.* ¶ 14.

The DHP system is accessible to students via StudentVUE. *Id.* ¶¶ 2, 12. To request a hall pass, students log in to their StudentVUE account, click "Hall Pass," click "Request a Hall Pass," and select a destination and duration. *Id.* ¶ 12 & Ex. B, at 3-5; Newton Decl. Ex. 3. Staff monitor and review real-time usage and approve hall pass requests. FAC ¶ 12. The DHP system "also includes more advanced behavioral and logistical features[,] such as limiting the number of students allowed in a given destination (e.g., a maximum of two students in the health room at one time), controlling when passes can be requested (e.g., disabling requests during the first and last [ten] minutes of a class), and enforcing individualized restrictions (e.g., preventing Student A from receiving a pass if Student B currently has one, even if the students are in different classrooms or grade levels)." *Id.* ¶ 13E & Ex. M, at 8. From time to time, the school's Behavioral Health and Wellness Team ("BHWT") reviews this data to identify patterns in student movement and flag students for "extraordinarily high" usage. *Id.* ¶¶ 13F, 17A (internal quotation marks omitted); *see* Peeremboom Decl. ¶ 15. These data reviews can result in staff-initiated meetings with students, without prior notice to parents, with the goal of increasing students' educational engagement and success in school. FAC ¶ 13F; Peeremboom Decl. ¶ 15. The BHWT involves parents when needed, on a case-by-case basis, to discuss identified issues and support those students. Peeremboom Decl. ¶ 15.

Although parents can view traditional attendance data, such as full-day absences, tardies, and excused or unexcused absences, through the ParentVUE portal, parents cannot view the data collected through the DHP system in ParentVUE or on any other parent-facing platform. FAC ¶ 13B. The data captured by the DHP system—consisting of the student's name, time of request, destination (*e.g.*, restroom,

4

health center, or locker), selected duration, approving staff member, and total time out—is stored in Synergy SIS with no published retention limit, purge policy, or expiration schedule. *Id.* ¶ 15A.

Approximately 150 staff members across the District have access to DHP data for students at MVMS. *Id.*; Corrected & Suppl. Decl. Steven Langford Supp. Def. Resp. Opp'n Pl. Mot. for TRO & Prelim. Inj. ("Langford Decl."), ECF [34], ¶¶ 6-7, 9. The list of authorized users includes MVMS staff, including the principal, assistant principals, classroom teachers, school counselors, and support staff, as well as individuals who serve all District students. FAC ¶ 15A & Ex. C; Langford Decl. ¶¶ 6, 8. The access granted to each staff member is limited in scope based on their job role. Langford Decl. ¶ 6. Those staff have access to DHP system data so that they can collectively support the effort to monitor students' whereabouts while at school and perform their job duties. *Id.* ¶¶ 6, 8.

**B.    Procedural Background**

On March 23, 2025, plaintiff submitted a formal complaint to defendant using its online complaint portal. FAC ¶ 22 & Ex. F. Due to the form's character limitations, plaintiff submitted a supplemental document via email containing a detailed explanation of his concerns that the DHP system violated federal and state law. *Id.* On April 3, 2025, defendant's Compliance Officer issued an initial response, stating that the DHP system did not require parental notice or consent, that the tracking of student movement in school was permissible under the doctrine of *in loco parentis*, and that defendant would not suspend use of the DHP system. *Id.* ¶ 22A & Ex. H, at 5. On April 6, 2025, plaintiff asked for his complaint to be escalated. *Id.* at Ex. H, at 4. Defendant's Compliance Officer stated that defendant would provide a response by May 1, 2025. *Id.* at Ex. H, at 2.

On April 21, 2025, plaintiff initiated this action in Washington County Circuit Court. Notice of Removal, ECF [1], ¶ 1. On April 24, 2025, defendant's General Counsel emailed plaintiff, stating that defendant would be pausing its internal complaint response due to plaintiff's pending lawsuit. FAC ¶ 23B & Ex. J. That same day, defendant removed the action to this Court. *See* Notice of Removal. On May 23, 2025, plaintiff filed the FAC. That same day, plaintiff also filed the instant motion for TRO and preliminary injunction. Pl. Mot. for TRO & Prelim. Inj. ("Pl. Mot."), ECF [9]. Plaintiff seeks to

5

immediately enjoin defendant's use of the DHP system across all schools in the District where it is deployed. On June 6, 2025, defendant filed a motion to dismiss, ECF [19], which is now pending before the Court.

## DISCUSSION

**A.    TRO**

First, in light of the timing of the parties' own proposed briefing schedule and the end of the 2024-2025 school year, as well as defendant's representation that the District is not using the DHP system during the summer, it is apparent that plaintiff's request for a TRO has become moot. Accordingly, the Court denies plaintiff's request for a TRO.

**B.    Preliminary Injunction**

As for plaintiff's request for preliminary injunction, the Court finds that plaintiff has not shown a likelihood of success on the merits on any of his claims.

1.    *Section 1983 Claims*

"To prevail under 42 U.S.C. § 1983, a plaintiff must prove that he was 'deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.'" *Regino v. Staley*, 133 F.4th 951, 959 (9th Cir. 2025) (quoting *Marsh v. County of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012)). Here, plaintiff asserts violations of his Fourteenth Amendment substantive and procedural due process rights.

a.    Substantive Due Process

As for plaintiff's substantive due process claim, plaintiff asserts that defendant's use of the DHP system violates his liberty interest in directing the care, custody, and upbringing of his child.

It is undisputed that the right "of parents and guardians to direct the upbringing and education of children under their control" is a fundamental right for purposes of the Fourteenth Amendment. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)). However, this broad parental right is not absolute: it "must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting *as parens patriae*[.]" *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012); *see*

6

*Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005), *op. am. on denial of reh'g on other grounds*, 447 F.3d 1187 (9th Cir. 2006) (per curiam).  "[O]nce parents make the choice as to which school their children will attend, their fundamental right to control the education of their children is, at the least, substantially diminished." *Fields*, 427 F.3d at 1206.  Parents

> "do not have a fundamental right generally to direct how a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, . . . or . . . a dress code, these issues of public education are generally committed to the control of state and local authorities."

*Id.* (citation modified).  Therefore, "identifying a general parental right is far different than concluding that it has been infringed."  *Hooks v. Clark Cnty. Sch. Dist.*, 228 F.3d 1036, 1042 (9th Cir. 2000).

The Supreme Court has cautioned courts to be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation omitted). Given this concern, courts must "begin with a careful description of the asserted fundamental liberty interest" and "then decide whether the asserted interest is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed."  *Regino*, 133 F.4th at 960 (internal quotation marks and citations omitted) (alteration in original).

In his motion, plaintiff loosely invokes general parental rights and emphasizes defendant's failure to notify or obtain parental consent before launching the DHP system.  In his reply, plaintiff focuses on defendant's use of the DHP system to flag students for meetings with counselors to address possible behavioral or psychological concerns without parental involvement.  Pl. Reply, ECF [20], at 3.  In his complaint, plaintiff likewise suggests that defendant's use of the DHP system to collect behavioral data and "trigger staff-led evaluations without involving families creates a constitutionally significant intrusion into parental decision-making."  FAC ¶ 36.  However, it is ultimately unclear whether plaintiff is asserting a parental right to decide whether defendant can collect student behavioral data through the DHP system, a parental right to decide whether defendant can use the data to initiate meetings with students to address

7

potential behavioral or psychological concerns, or merely a parental right to notice if such activities occur. Regardless, the Court concludes that none of these asserted rights are "deeply rooted in this Nation's history and tradition, . . . such that neither liberty nor justice would exist if [they were] sacrificed." *Regino*, 133 F.4th at 960. Accordingly, plaintiff's asserted liberty interest is not fundamental in nature and therefore not protected under the substantive due process clause of the Fourteenth Amendment.

Because the right to direct how defendant collects or uses student behavioral data is not a fundamental one, defendant's use of the DHP system need only be "'rationally related to legitimate government interests.'" *Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*, 4 F.4th 747, 759 (9th Cir. 2021) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997)). This standard is clearly satisfied here: defendant's use of the DHP system is rationally related to the legitimate government interests of monitoring students' attendance, physical location, and class participation to ensure student safety and general welfare. Accordingly, plaintiff does not allege a deprivation of substantive due process.

b.  Procedural Due Process

As for plaintiff's procedural due process claim, plaintiff asserts that defendant violated his procedural due process rights by failing to notify, obtain consent from, or provide an opt-out opportunity to plaintiff before collecting data through the DHP system and using those data to initiate student interventions. Citing 34 C.F.R. § 99.31(a)(1)(i)(A), plaintiff contends that FERPA and the PPRA only allow defendant to disclose educational records without parental consent if a school official has a "legitimate educational interest" and that defendant's failure to comply with these statutes violated his right to procedural due process. FAC ¶¶ 35-36.

Unlike plaintiff's substantive due process claim, his procedural due process claim does not require allegations of a fundamental right. "Rather, procedural due process 'protects all liberty interests that are derived from state law or from the Due Process Clause itself.'" *Regino*, 133 F.4th at 967 (quoting *Mullins v. Oregon*, 57 F.3d 789, 795 (9th Cir. 1995)).

As an initial matter, FERPA does not provide an individually enforceable right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002). As such, the Court doubts that a violation of FERPA could support

8

a procedural due process claim. *See Schrader v. Emporia State Univ.*, No. 19-2387-DDC-TJJ, 2021 WL 4284543, at *8 n.6 (D. Kan. Sept. 21, 2021); *see also Dixon v. Regents of Univ. of N.M.*, 242 F.3d 388 (table), 2000 WL 1637557, at *4 n.4 (10th Cir. 2000) (unpublished); *McLaughlin v. Fla. Int'l Univ. Bd. of Trs.*, 533 F. Supp. 3d 1149, 1171 (S.D. Fla. 2021). Based on the Supreme Court's reasoning in *Gonzaga University*, this Court similarly finds it unlikely that the PPRA provides an individually enforceable right or that a PPRA violation could support a procedural due process claim. *See* 536 U.S. at 280-89.

However, even assuming that they could, plaintiff does not explain how FERPA or the PPRA guarantees the liberty interest that he asserts, nor does he show how defendant has violated either FERPA or the PPRA. FERPA does not require defendant to notify parents when it creates an education record or to proactively permit access to the DHP system; indeed, plaintiff acknowledges that he could request his child's DHP data under FERPA. *See generally* 20 U.S.C. § 1232g. FERPA also permits disclosure of education records without the written consent of students' parents to "other school officials, including teachers within the educational institution or local educational agency, who have been determined by such agency or institution to have legitimate educational interests, including the educational interests of the child for whom consent would otherwise be required." 20 U.S.C. § 1232g(b)(1)(A); *see* 34 C.F.R. § 99.31(a)(1)(i)(A). Defendant has determined that certain groups of staff members have legitimate educational interests and explains why these staff have access to data in the DHP system based on their job responsibilities. Plaintiff asserts that many of these staff have "no educational relationship to the students being monitored," Pl. Mot. 3, but brings no real argument to the contrary.

The PPRA requires the consent of a student's parent before a student is "required . . . to submit to a survey, analysis, or evaluation" that reveals certain information, including, in relevant part, the "mental or psychological problems of the student or the student's family[.]" 20 U.S.C. § 1232h(b)(2). However, submission of information that is not protected by the PPRA does not violate the PPRA. *See, e.g., Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 3:22-cv-337, 2023 WL 5018511, at *22 (S.D. Ohio Aug. 7, 2023), *appeal docketed*, No. 23-3740 (6th Cir. Sept. 8, 2023). Plaintiff's contention that the DHP system is a survey, analysis, or evaluation that reveals a student's mental or psychological problems

9

overstates how the DHP system functions. The DHP system requires students to log in to StudentVUE, click "Hall Pass," click "Request a Hall Pass," and select a destination and duration. This simply does not constitute a survey under the PPRA. Additionally, the DHP system does not request information that is protected under the PPRA. The fact that a school's BHWT may later review the data as part of determining whether students need additional support does not mean that the information itself reveals any "mental or psychological problems of [a] student." 20 U.S.C. § 1232h(b)(2).

Because plaintiff does not allege a protected interest to which due process protections attach, he does not allege a deprivation of protected due process. Therefore, plaintiff does not show that he is likely to succeed on his section 1983 claims.

2. *ORS § 336.187 Claim*

Plaintiff asserts that defendant's use of the DHP system violates ORS § 336.187. ORS § 336.187 requires school districts to disclose students' personally identifiable information ("PII") or other information allowed to be disclosed under FERPA in two situations, neither of which apply here. However, the statute does not provide for a private right of action. Furthermore, none of plaintiff's allegations reflect a failure to disclose PII under the two circumstances described in the statute. Accordingly, plaintiff does not show that he is likely to succeed on his ORS § 336.187 claims.

3. *Oregon Constitutional Claim*

Finally, plaintiff asserts that defendant's use of the DHP system constitutes an unreasonable informational search under Article I, section 9 of the Oregon Constitution.[2] Article 1, section 9 "establishes a right of the people 'to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure.'" *State v. Fulmer*, 366 Or 224, 229, 460 P.3d 486 (2020) (en banc) (quoting *State v. Rodgers/Kirkeby*, 347 Or. 610, 621, 227 P.3d 695 (2010))). "For purposes of Article I, section 9, a search occurs only if governmental action invades 'a protected privacy interest.'" *State v. Newcomb*, 359 Or. 756, 764, 375 P.3d 434 (2016) (quoting *State v. Wacker*, 317 Or 419, 426, 856 P.2d 1029 (1993)). "'[T]he

---

[2] Although plaintiff asserts a claim under Article I, section 10 of the Oregon Constitution in the FAC, he does not discuss this claim in his briefing. Therefore, the Court declines to address this claim.

privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*.'" *Id.* (quoting *State v. Campbell*, 306 Or 157, 164, 759 P.2d 1040 (1988)) (emphases in original). To challenge a search as violating Article I, section 9, an individual must assert that their personal rights were violated, as distinguished from someone else's rights. *State v. Johnson*, 153 Or. App. 535, 538 n.1, 958 P.2d 887 (1998) (en banc).

Here, plaintiff argues that the DHP system constitutes digital surveillance and "frustrate[s] [his] ability to oversee or object to data-gathering about his own child." Pl. Reply 4. However, it is clear from the complaint and briefing that plaintiff bases this claim on the allegations that the DHP system collects and stores behavioral data of students in the District, including his daughter's. Plaintiff does not assert a personal privacy right over those data, and thus plaintiff cannot challenge the DHP system under Article I, section 9.

Even if the Court were to assume that plaintiff has a protected privacy interest in his child's DHP data, defendant's use of the DHP system does not violate Article I, section 9. Article I, section 9 is reviewed under the same standards as the Fourth Amendment. *State v. Flores*, 280 Or 273, 280-81, 570 P.2d 965 (1977) (en banc). Thus, the touchstone for determining the constitutionality of a search is its reasonableness, which requires "balancing the nature of the intrusion on the individual's privacy against the promotion of legitimate governmental interests." *Bd of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 829 (2002) (citation omitted). As is the case here, "[a] student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." *Id.* at 830.

The character of the intrusion into the limited privacy interest is also minimal: in essence, students are merely informing their teachers where they need to go and for how long. Although the DHP system stores the data, the data does not "lead to the imposition of discipline or have any academic consequences[,]" *id.* at 833; to the contrary, a school's BHWT reviews the data as part of determining whether it can provide any additional support to certain students. Moreover, defendant has legitimate government interests in recording class attendance, increasing the amount of time students are spending in

class learning, maintaining a safe educational environment for students and employees, and monitoring students' whereabouts on campus in case of an emergency. Defendant has also shown that the DHP system is a reasonably effective means of achieving these purposes. Since the implementation of the DHP system, there are fewer students out of class at any given time, which has led to increased classroom attendance and educational engagement, decreased behavior incidents in non-classroom settings, and a reduction in incidents of vandalism on campus. The DHP system has also created a streamlined process for requesting hall passes and increased efficiency in both requesting and reviewing hall passes. In this context, defendant's use of the DHP system is a reasonable means of furthering its important interests in maintaining a safe educational environment for its students. Accordingly, plaintiff does not show that he is likely to succeed on his claim under Article I, section 9.

Because plaintiff has not shown a likelihood of success on the merits on any of his claims, the Court finds it unnecessary to address the remaining *Winters* factors.

## CONCLUSION

For the foregoing reasons, plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, ECF [9], is DENIED.

IT IS SO ORDERED.

DATED this 18th day of July, 2025.

Adrienne Nelson
United States District Judge